NOT FOR PUBLICATION                    [Docket Nos. 92, 93]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| MICHAEL KILLION, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CHIEF JOHN COFFEY, et al., <br><br> Defendants. | Civil No. 13-1808 (RMB/KMW) <br><br> **OPINION** |

Appearances:

Katherine D. Hartman
Attorneys Hartman, Chartered
505 S. Lenola Road, Suite 121
Moorestown, NJ 08057-1590
      Attorney for Plaintiffs Michael Killion, Michael Biazzo,
      William Hertline, Socrates Kouvatas, and Erik Morton

Francis X. Manning
Stradley, Ronon, Stevens & Young, LLP
LibertyView
457 Haddonfield Road, Suite 100
Cherry Hill, NJ 08002
      Attorney for Defendants John Coffey and Michael Probasco

Richard L. Goldstein
Marshall, Dennehey, Warner, Coleman & Goggin, PA
Woodland Falls Corporate Park
200 Lake Drive East, Suite 300
Cherry Hill, NJ 08002
      Attorney for Defendants Rick Taylor, Betsy McBride, John
      Kneib, John Figueroa, Ed Growchowski, and the Township of
      Pennsauken

**BUMB**, United States District Judge:

      This matter comes before the Court upon two motions to

dismiss the Second Amended Complaint [Docket No. 81]: the Motion

1

to Dismiss filed by Defendants John Coffey ("Coffey") and
Michael Probasco ("Probasco") [Docket No. 92] and the Motion to
Dismiss filed by Defendants John Figueroa, Ed Growchowski, John
Kneib, Betsy McBride, Rick Taylor (collectively, the "Individual
Defendants"), and the Township of Pennsauken (together with the
Individual Defendants, the "Township Defendants") [Docket
No. 93].  As Coffey, Probasco, and the Township Defendants
(collectively, the "Defendants") explicitly rely on each other's
arguments, the motions will be addressed jointly.  For the
reasons set forth below, the motions to dismiss will be granted
with prejudice.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

The underlying facts of this suit are recited in the
Court's previous motion to dismiss opinion issued on November
19, 2015 [Docket No. 77] (the "November 2015 Opinion").  The
Court incorporates the facts as set forth in the November 2015
Opinion by reference to the extent those facts have been
restated in the Second Amended Complaint.  The Court will
nevertheless provide an overview of the relevant factual and

---

[1] The facts recited herein are derived from Plaintiffs' Second
Amended Complaint.  The Court must accept these facts as true
for the purpose of these motions to dismiss.  See McTernan v.
City of York, 577 F.3d 521, 526 (3d Cir. 2009) ("In deciding a
motion to dismiss, all well-pleaded allegations of the complaint
must be taken as true and interpreted in the light most
favorable to the plaintiffs, and all inferences must be drawn in
favor of them.") (internal quotations and citations omitted).

procedural background and will discuss the new allegations included in the Second Amended Complaint.  However, as the Court writes only for the parties, it assumes the reader's familiarity with the facts and recites only those relevant to the decision herein.

Plaintiffs Michael Killion, Michael Biazzo, Socrates Kouvatas, Erik Morton, and William Hertline (the "Plaintiffs") are five police officers employed by the Pennsauken Police Department.[2]  The Plaintiffs are active members of the Fraternal Order of Police ("FOP 3"), the union that represents Pennsauken police officers.  Second Amended Complaint ¶ 24 [Docket No. 81] ("SAC").  They are all vocal and outspoken supporters of the implementation of twelve hour shifts at the Pennsauken Police Department.  SAC ¶ 25.  Plaintiff Morton, for example, joined the FOP 3 executive board in 2007 and "immediately began to work actively to obtain twelve hour shifts."  SAC ¶ 162.

In 2010 and early 2011, the FOP 3 and the police administration engaged in contract negotiations regarding the implementation of twelve hour shifts.  Plaintiffs Killion, Biazzo, and Hertline were members of the FOP 3 Contractual

---

[2] This action was originally filed by seven Pennsauken police officers.  Two of the original plaintiffs, Douglas Foster and Mark Bristow, are no longer named as plaintiffs in the Second Amended Complaint.  All allegations pertinent only to Douglas Foster and Mark Bristow have been removed from the Second Amended Complaint.

Negotiation Committee, which was involved in these negotiations. SAC ¶¶ 31, 75, 112.  According to Plaintiffs, Defendant Coffey was "angry with the negotiation surrounding the twelve hour shifts, and directly tried to interfere with the appointment of the members of the negotiation committee."  SAC ¶ 196.  The Second Amended Complaint, however, includes no allegations of specific instances of such interference.  Plaintiffs allege only that when Plaintiff Hertline was running a union award banquet, "the Administration refused to participate in the issuance of joint awards with the Union as they had in the past."  SAC ¶ 197.  Likewise, Plaintiffs allege that "[s]ince Hertline's support for the twelve hour shifts, he has been denied administrative leave time to attend FOP meetings."  SAC ¶ 115.

Approximately twelve meetings regarding the twelve hour shifts took place.  SAC ¶ 35.  Defendant "Coffey repeatedly made his opposition to the imposition of twelve hour shifts known [at these meetings] and, at times, these meetings became quite heated."  SAC ¶ 34.  In the Second Amended Complaint, Plaintiffs briefly describe certain of these meetings.  At a meeting on April 12, 2010, Plaintiffs Killion and Biazzo met with Captain Connors, Lieutenant Nichols, and Defendant Coffey regarding the adoption of twelve hour shifts.  SAC ¶ 28a.  The following week, Defendant Coffey sent Defendant Growchowski, the Township Administrator, a memorandum that included questions and concerns

regarding the twelve hour shifts "indicating his opposition to
their implementation." SAC ¶ 28b. On April 22, 2010, Biazzo,
Killion, Coffey, Growchowski, and Captain Connor attended
another meeting. SAC ¶ 28c. Plaintiffs do not set forth any
allegations regarding the subject matter of that meeting. On
April 28, 2010, Biazzo, Killion, and Coffey met once again to
discuss the twelve hour shifts. SAC ¶ 28d.

In February 2011, the Pennsauken police department
implemented twelve hour shifts "for the rank and file, in spite
of Coffey's opposition." SAC ¶ 47.

At some point in 2011, certain of the Plaintiffs attended a
union conference regarding their rights during internal affairs
investigations. Defendant Coffey thereafter told "the Union
members that they should not assert their rights" as taught at
the conference. SAC ¶¶ 194-95.

On October 11, 2011, Biazzo and Killion once again met with
Defendant Coffey and certain unidentified others, but the
subject matter of the meeting is not pled in the Second Amended
Complaint. SAC ¶ 28e. A few months later, on January 19, 2012,
Defendant Coffey wrote a memorandum "complaining" about the
twelve hour shifts, to which Biazzo responded on behalf of the
FOP 3. SAC ¶¶ 28f, 28g. Shortly thereafter, Killion and Biazzo
attended another meeting during which Defendants Coffey and
Probasco "complained about the shifts and claimed there were no

'pros' about the change." SAC ¶ 28h.  The following week, certain unidentified union representatives met with Coffey, Probasco, Growchowski, Captain Connor, and the Public Safety Director.  According to Plaintiffs, at this meeting, "Coffey refused to agree to any suggestions or recommendations to address his objections to the shifts." SAC ¶ 28i.  Since the implementation of the twelve hour shifts, Plaintiff Kouvatas has "on numerous occasions pointed out that the problems Coffey has with twelve hours [sic] shifts could be remedied if the supervisors were also on twelve hour shifts." SAC ¶ 152.  But "Coffey has repeatedly scorned Kouvatas's input." SAC ¶ 153.

On May 23, 2012, Coffey and Growchowski, as well as the Public Safety Director, met with Killion and Biazzo "to discuss Coffey's apparently punitive policy changes since the shifts were implemented." SAC ¶ 28j.  A few months later, they met with the Chief Financial Officer to further discuss Coffey's purported policy changes.  SAC ¶ 28k.

In Plaintiffs' view, "[t]he Defendants have consistently and systematically retaliated against the Plaintiffs for the exercise of their First Amendment rights." SAC ¶ 26.  For example, Defendant Probasco has "made numerous derogatory comments" about Plaintiffs Killion and Biazzo.  SAC ¶¶ 37-40, 56, 78-80.  Defendant Coffey no longer speaks to Plaintiffs and

does not even address them when they pass each other in the hall.  <u>See, e.g.</u>, SAC ¶¶ 64-65, 99, 130, 132, 155, 173-74.

Shortly after he became a Pennsauken police officer in 2001, Plaintiff Kouvatas "began to research the efficiency of twelve hour shifts" and "authored a position paper" in support of their implementation.  SAC ¶¶ 143-45.  A short time after he submitted the paper, Plaintiff Kouvatas "began to be harassed at work."  SAC ¶ 148.  Plaintiffs allege that "[o]ne supervisor routinely yelled and used obscenities to Kouvatas whenever the subject of twelve hour shifts came up."  SAC ¶ 149.

In 2008, Plaintiff Morton's permission to take a day off was revoked, causing him to file a grievance.  Defendant Coffey denied the grievance and made the denial available for the entire Police Department to see.  SAC ¶ 166.  Shortly thereafter, Coffey demanded that Morton write memoranda to explain log entries and other "minor issues."  SAC ¶ 167.  At some unspecified point thereafter, Morton requested a transfer to another Township because "[t]hings became so unpleasant," but Coffey denied the transfer.  SAC ¶ 169.

Months after the implementation of the twelve hour shifts in 2011, Plaintiffs Killion, Biazzo, Hertline, and Kouvatas were involved in an altercation at Pinsetters Bowling Alley and Bar (the "Pinsetters Incident").  SAC ¶ 52.  In the aftermath of the Pinsetters Incident, "Coffey ordered that no interviews be

conducted and hand typed hundreds of questions directed to the officers."  SAC ¶ 53.  Killion, Biazzo, Hertline, and Kouvatas were charged and disciplined as a result of the Pinsetters Incident.  SAC ¶¶ 81, 115, 118, 154.[3]

Plaintiffs claim that "[t]he way the discipline is served is retaliatory as well."  SAC ¶ 68.  For example, Plaintiffs contend that the investigation into the Pinsetters Incident "targeted only Union members who supported twelve hour shifts; and others who took the exact same actions, or inactions, but did not vocally support the twelve hour shifts, were not disciplined."  SAC ¶ 54.  Furthermore, Plaintiffs allege that "[i]f suspended, officers who were not proponents of the twelve hour shifts are afforded the opportunity to work during their suspension with a percentage of their regular pay withheld. This is not the case for those disciplined who were active

---

[3] Their suspensions were affirmed on appeal by the Superior Court of New Jersey, Appellate Division on September 22, 2016.  See Opinion, Docket No. A-3537-13T1 [Docket No. 105, Ex. A]; In the Matter of Michael Biazzo, Douglas Foster, William Hertline, III, Vito Moles, Michael Killion & Michael Hutnan, Twp. of Pennsauken Police Dep't, No. A-3537-13T1, 2016 WL 5173411, at *5 (N.J. Super. Ct. App. Div. Sept. 22, 2016).  The Court considers and takes judicial notice of the Appellate Division's decision, as a matter of public record and as a document whose accuracy cannot reasonably be questioned.  See Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (a court may consider, in evaluating a motion to dismiss, "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.").

proponents of the twelve hour shifts." SAC ¶ 69. Biazzo, for example, was not permitted to work during his suspension after the Pinsetters Incident with a percentage of his regular pay withheld, while "officers who were not vocal proponents of the twelve hour shifts" were permitted to do so. SAC ¶ 82.

At some point after the twelve hour shifts were implemented in February 2011, Defendant Coffey changed Plaintiff Killion's daily lineup and assigned him to a less attractive district. SAC ¶ 50. Then, in September 2011, Killion was removed from the Traffic Division. SAC ¶ 51.

In January 2012, Defendant Coffey wrote a memorandum to Defendant Growchowski and the Township Committee regarding Plaintiff Killion's use of sick time. Killion had not been notified that he was under investigation for his use of sick time and he ultimately received a written reprimand on March 15, 2012. SAC ¶¶ 55, 57.

On March 17, 2012, Plaintiff Biazzo received a disciplinary notice regarding his involvement in an off-duty incident at Bryson's Pub. SAC ¶ 84. As a result, he was suspended with pay. SAC ¶ 88. According to Plaintiffs, however, other officers who were also involved only received letters of reprimand. SAC ¶ 85.

On May 24, 2012, Plaintiff Killion received another written reprimand relating to an on-duty motor vehicle accident and was

transferred to the nightshift by Defendant Coffey.  SAC ¶¶ 58-
62.  In September 2012, Plaintiff Morton was disciplined by
Coffey for failing to report for light duty.  SAC ¶ 170-71.  On
August 20, 2013, Killion was disciplined again for abuse of sick
time and insubordination.  SAC ¶ 63.  Then in September 2013,
Defendant Probasco ordered that Plaintiff Hertline "be given a
letter of counseling for a report which had been approved by his
supervisor and which was in accordance with recent mandatory
training."  SAC ¶ 129.  Two months later, Plaintiff Biazzo was
also disciplined for failure to timely pay his country club dues
in 2010 and 2013.  SAC ¶ 104.  Then, on May 12, 2014, Plaintiff
Kouvatas was served with a disciplinary notice "from an event
which occurred more than a year prior."  SAC ¶ 157.  On July 27,
2015, while Biazzo was working a road detail, Probasco made an
announcement over the police radio that "suggest[ed] [Biazzo]
was involved in a domestic violence incident on the street."
SAC ¶ 106.

Plaintiffs allege that the Township Defendants were aware
of their concerns regarding retaliation against them due to
their support for the implementation of twelve hour shifts.
SAC ¶ 175.  For example, on two occasions, Barbara Hertline,
Plaintiff Hertline's wife, wrote to Defendant Taylor and the
members of the Township Committee regarding Coffey's "apparent
retaliation against officers since the implementation of twelve

10

hour shifts," but received no response.  SAC ¶¶ 176, 179.  She later addressed the Township Committee in a public meeting.  SAC ¶ 180.  Plaintiffs' counsel also "inform[ed] the Committee of what [Plaintiffs] believed was Coffey's policy of discriminating against supporters of twelve hour shifts."  SAC ¶ 177.  A few months later, Coffey informed Ms. Hertline that an internal affairs investigation would be initiated, but no action was ever taken.  SAC ¶¶ 181–82.

On March 22, 2013, the original seven plaintiffs filed this lawsuit against Chief Coffey, Lieutenant Probasco, the Township of Pennsauken, each of the Township Committee's members, and the Township Administrator, Ed Growchowski, alleging that the Defendants unlawfully retaliated against them for exercising their First Amendment rights and that the Growchowski and the Township Committee members failed to investigate their allegations of unlawful retaliation.[4]  On November 19, 2015, the

---

[4] Defendants argue again that "Plaintiffs' claims against the Township of Pennsauken Police Department must be dismissed, because the police department is not a separate legal entity subject to suit or having the ability to sue."  Township Defendants Brief ("Twp. Br.") at 18 [Docket No. 93-4]. Plaintiffs respond that they do not seek to bring any claims against it.  Plaintiffs' Opposition Brief ("Pls. Opp. Br.") at 28 [Docket No. 98].  The Court reaches the same conclusion regarding this argument as it did in its November 2015 Opinion. The Pennsauken Police Department is not listed as a defendant or in the case caption. The Plaintiffs clearly do not intend to sue the Pennsauken Police Department separately.  The Court nonetheless reminds the parties that "a police department is not a 'person' subject to suit under 42 U.S.C. § 1983 pursuant to

Court dismissed Plaintiffs' First Amended Complaint [Docket No. 27], upon Defendants' motions, without prejudice and granted Plaintiffs a final opportunity to amend their pleadings within twenty-one days [Docket Nos. 77, 78].

On January 11, 2016, the Plaintiffs filed the Second Amended Complaint.  The Second Amended Complaint no longer names Deputy Mayor Jack Killion as a defendant and sets forth four claims: (1) retaliation in violation of Plaintiffs' right to freedom of speech under the First Amendment to the United States Constitution, in violation of Section 1983 (Count I); (2) retaliation in violation of Plaintiffs' right to freedom of association under the First Amendment, in violation of Section 1983 (Count II); (3) violation of the New Jersey Civil Rights Act (Count III); and (4) a punitive damages claim (Count IV). Defendants have moved to dismiss the Second Amended Complaint.

## II.  MOTION TO DISMISS STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550

---

Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 688-90 (1978)."  Hannah v. Bridgewater Police Dep't, 2014 WL 4272759, at *2 (D.N.J. Aug. 28, 2014).

U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 663.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss.  Id. at 678.  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

In reviewing a plaintiff's allegations, a district court should conduct a three-part analysis:

> First, the court must take note of the elements a
> plaintiff must plead to state a claim.  Second, the
> court should identify allegations that, because they
> are no more than conclusions, are not entitled to the
> assumption of truth.  Third, when there are well-
> pleaded factual allegations, a court should assume
> their veracity and then determine whether they
> plausibly give rise to an entitlement for relief.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (internal citations, quotations, and alterations omitted) (quoting Iqbal, 556 U.S. at 675, 679).

Rule 12(b)(6) requires the district court to "accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those

allegations in the light most favorable to the plaintiff."
Bistrian v. Levi, 696 F.3d 352, 358 n. 1 (3d Cir. 2012).  Only
the allegations in the complaint and "matters of public record,
orders, exhibits attached to the complaint and items appearing
in the record of the case" are taken into consideration.
Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384
n. 2 (3d Cir. 1994) (citing Chester County Intermediate Unit v.
Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990)).

### III. LEGAL ANALYSIS

#### A. Section 1983 Claims

Plaintiffs assert two claims under Section 1983 of the
Civil Rights Act, alleging retaliation in violation of
Plaintiffs' First Amendment rights to freedom of speech (Count
I) and freedom of association (Count II).  Plaintiffs also bring
a claim under the New Jersey Civil Rights Act, alleging similar
violations (Count III).  "This district has repeatedly
interpreted [the New Jersey Civil Rights Act] analogously to §
1983."  Pettit v. New Jersey, 2011 WL 1325614, at *3 (D.N.J.
Mar. 30, 2011) (collecting cases); accord Borden v. Sch. Dist.
Of Twp. Of E. Brunswick, 523 F.3d 153, 164 n. 5 (3d Cir. 2008).
Accordingly, the Court will consider Plaintiffs' New Jersey
Civil Rights claim together with the claims under Section 1983.

To state a retaliation claim under Section 1983 for
violation of the right to freedom of speech, the Plaintiffs must

allege facts showing: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action. Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006). Similarly, to allege a Section 1983 retaliation claim for violation of the freedom of association, Plaintiffs "must show that they were engaged in constitutionally protected conduct, which conduct was a 'substantial' or 'motivating factor' in the government employer's [adverse employment] decision." Rode v. Dellarciprete, 845 F.2d 1195, 1204 (3d Cir. 1988) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). As the claims share the same elements, the Court will address the freedom of speech and freedom of association claims together, as appropriate.

### i. **Constitutionally Protected Conduct**

Public employees, including police officers, "do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). The Court will first address the degree to which the requisite showings for constitutionally protected conduct may vary between Plaintiffs'

two First Amendment claims.  Generally, to establish that Plaintiffs have engaged in constitutionally protected conduct, Plaintiffs must allege (1) that they acted or spoke as private citizens, as opposed to pursuant to their official duties, regarding (2) a matter of public concern, and (3) that the police administration did not have an adequate justification for treating them differently from any other member of the general public as a result of their conduct.  Hill v. Borough of Kutztown, 455 F.3d 225, 241-42 (3d Cir. 2006) (citing Garcetti, 547 U.S. at 417).

Plaintiffs contend that the Court need not engage in the Garcetti analysis described above for either of its First Amendment claims because "[u]nion activity is per se protected conduct."  Pls. Opp. Br. at 12-13.  In Plaintiffs' view, since the implementation of twelve hour shifts was an issue presented in the negotiations between the union and the police administration, it is per se a matter of public concern. Id. at 13 (citing Crane v. Yurick, 287 F. Supp. 2d 553, 560 (D.N.J. 2003)).

The Court begins with the freedom of association claim. There is a split between the federal Circuits as to whether the public concern requirement applies to First Amendment freedom of association retaliation claims.  The Third Circuit has not yet definitively decided the question.  See LaPosta v. Borough of

16

Roseland, 309 F. App'x 598, 603 (3d Cir. 2009) (recognizing that

it "is an open question in this Circuit" "as to whether the

public concern requirement applies equally to free association

claims"); Sanguigni v. Pittsburgh Bd. of Pub. Educ., 968 F.2d

393, 400 (3d Cir. 1992) (recognizing Circuit split on this

issue, but declining to decide the question).[5]

---

[5] The Court notes, however, that the majority of Circuits apply
the public concern requirement to freedom of association claims.
See, e.g., Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa
Fe, 654 F.3d 1073, 1085 (10th Cir. 2011) (applying private
citizen and public concern requirements to freedom of
association claim); Hudson v. Craven, 403 F.3d 691, 698 (9th
Cir. 2005) (applying public concern requirement to hybrid
freedom of association and speech claims); Cobb v. Pozzi, 363
F.3d 89, 102 (2d Cir. 2004) ("We agree with the defendants and,
joining the Fourth, Sixth and Seventh circuits, hold that a
public employee bringing a First Amendment freedom of
association claim must persuade a court that the associational
conduct at issue touches on a matter of public concern."); Klug
v. Chicago Sch. Reform Bd. of Trustees, 197 F.3d 853, 857 (7th
Cir. 1999) ("In this circuit, a public employee is protected
from adverse employment consequences based on the exercise of
the right to freedom of association only when the associational
conduct relates to a matter of public concern."); Edwards v.
City of Goldsboro, 178 F.3d 231, 249 (4th Cir. 1999)
("Logically, the limitations on a public employee's right to
associate are 'closely analogous' to the limitations on his
right to speak."); Boals v. Gray, 775 F.2d 686, 691-93 (6th Cir.
1985) (finding that public concern and private citizen
requirements must be applied to freedom of association claim and
holding that "an employee's speech, activity or association,
merely because it is union-related, does not touch on a matter
of public concern as a matter of law"); but see Coughlin v. Lee,
946 F.2d 1152, 1158 (5th Cir. 1991) (finding that its
"conclusion that plaintiffs' speech did not raise matters of
public concern does not foreclose their" freedom of association
claim); Hatcher v. Bd. of Pub. Educ. & Orphanage for Bibb Cty.,
809 F.2d 1546, 1558 (11th Cir. 1987) ("In short, application of
a requirement that associational activity relate to a matter of
public concern in order to be constitutionally protected would

The Third Circuit has, however, repeatedly applied the public concern requirement to freedom of association claims that are closely linked to or mere extensions of freedom of speech claims.  For example, the Third Circuit in <u>Bell v. City of Philadelphia</u> expressed that, it has "no problem applying the public concern requirement" where the plaintiff's "associational claim is barely an extension of his free speech claim."  275 F. App'x 157, 160 (3d Cir. 2008) (citing <u>Sanguigni</u>, 968 F.2d at 400; <u>Dible v. City of Chandler</u>, 502 F.3d 1040, 1050 (9th Cir. 2007) (finding that public employee cannot "resurrect fallen speech claims as privacy and associational claims")).

Likewise, in <u>Sanguigni</u>, the Third Circuit held that, while it was not "necessary to confront the issue whether <u>Connick</u> [and, therefore, the public concern requirement] generally applies to claims involving the freedom of association," it would apply the requirement in the case before it because the plaintiff's "associational claim was 'based on speech' and did not implicate associational rights 'to any significantly greater degree' than the speech at issue in the seminal Supreme Court free speech case that gave rise to the public concern requirement."  <u>Id.</u> (citing <u>Connick v. Myers</u>, 461 U.S. 138 (1983)); <u>see also</u> <u>Gorum v. Sessoms</u>, 561 F.3d 179, 185 (3d Cir.

---

overturn Supreme Court and Eleventh Circuit jurisprudence and exact a substantial toll upon first amendment liberties.").

2009) (noting that plaintiff's "associational claim is linked closely enough with his free-speech claim to justify application of the citizen-speech and public-concern requirements."); Beresford v. Wall Twp. Bd. of Educ., 2010 WL 445684, at *7 (D.N.J. Feb. 3, 2010) (applying public concern requirement to freedom of association claim, reasoning that "Plaintiff's freedom of association claim mirrors his freedom of speech claim in that it relates to the same union speech and attendant circumstances.").

Here, the Defendants argue that "[i]n an attempt to get a second bite at the apple," Plaintiffs "repackage [their] freedom of speech claims as freedom of association claims."  Coffey Br. at 23.  The Court agrees.  For example, Plaintiffs' freedom of speech claim comprises the first 191 paragraphs of the Second Amended Complaint.  The freedom of association adds a mere seven paragraphs, two of which are bare-boned conclusions.  See SAC ¶¶ 198-99.  As will be discussed in further detail below, the remaining allegations do not support a claim for freedom of association.  The core of Plaintiffs' freedom of association claim is the same as the freedom speech claim, namely that Plaintiffs were retaliated against for supporting the implementation of twelve hour shifts.  In fact, Plaintiffs readily concede that they "were not involved in organizing a union" and instead argue that their advocacy for twelve hour

19

shifts is union activity that merits unconditional protection as association.  Pls. Opp. Br. at 16.

In the end, the Second Amended Complaint and the Plaintiffs' opposition brief make clear that the two claims are closely linked and mirror each other.  Accordingly, the Court finds that Plaintiffs' freedom of association claim is "barely an extension" of their freedom of speech claim and, therefore, the Court has "no problem applying the public concern requirement in this context."  See Bell, 275 F. App'x at 160.  The Court will evaluate the claims together, as appropriate, and will apply the public concern requirement.

The Court also rejects Plaintiffs' contention that they are excused from pleading these elements to establish even their freedom of speech claim because, in their view, all union activity is per se protected conduct.  For this proposition, as the Court noted above, Plaintiffs rely upon Crane, 287 F. Supp. 2d at 560.  Crane, however, is distinguishable.  Crane involved speech regarding a union's negotiation of a new collective bargaining agreement and the defendant's interception and reading of a sealed letter regarding the agreement.  Judge Irenas found that this speech and conduct was protected because it "directly implicates one of the most recognized First Amendment protections--union-related speech."  87 F. Supp. 2d at 560.  As such, this speech and conduct, which interfered with

20

union contract negotiations and union organization efforts, was "clearly a matter of public concern." Id. The defendant in Crane actually interfered with the union's ability to organize and communicate. There are no well-pled allegations of similar conduct in the Second Amended Complaint. The Plaintiffs' speech in support of twelve hours shifts may have been an issue that the FOP 3 supported, but it was not in and of itself "union-related speech."

It bears noting that constitutional protection is not automatically granted to all speech and conduct by union members. Thomas v. Delaware State Univ., 626 F. App'x 384, 388 (3d Cir. 2015) ("While it is true that union activities may sometimes touch on a matter of public concern, . . . it is not the case that all union-related grievances do[.] [Plaintiff's] grievances related to 'working conditions and other issues in union members' employment' and [Plaintiff] offers nothing that would transform those personnel matters into issues of interest to the broader community.").

Instead, courts generally engage in the aforementioned analysis to determine whether speech by union members is protected activity. For example, in Beresford, 2010 WL 445684, at *6, the court found that a union president's speech regarding raises, sick days, and overtime during union contract

negotiations was not protected speech.  The Beresford court

reasoned that:

> First, Plaintiff was not acting as a private citizen
> when engaging in speech as a public employee and
> President of the WITA union because such speech was
> performed while Plaintiff was in his official capacity
> as negotiator of his union.  Second, Plaintiff was not
> speaking on a matter of public concern as his speech
> did not relate to 'any matter of political, social or
> other concern to the community.'  In fact, Beresford's
> speech involved his own personal demands and
> complaints in addition to the grievances of a few
> members of his WITA union.  Plaintiff admits that his
> contractual negotiations were related to his and the
> WITA members' employment, raises, sick days and
> overtime. . . . Although union-related speech is
> generally a matter of public concern, the union-
> related speech in this case does not rise to such a
> level as it relates only to the employee's generalized
> personal grievances and gain.  Additionally, the
> speech was not engaged in with the purpose of
> informing the public that the government discharged
> its responsibilities or of bringing to light the
> government's breach of public trust.  Without a
> finding that Plaintiff's speech was a matter of public
> concern and engaged in as a private citizen, the first
> prong for a violation of Plaintiff's First Amendment's
> right of freedom of speech is not satisfied.

Beresford, 2010 WL 445684, at *6; see also Hill v. City Of

Philadelphia, 331 F. App'x 138, 142 (3d Cir. 2009) (affirming

district court's determination that plaintiff did not engage in

protected speech because he "did not show that he was acting as

a citizen in his union representation . . . or that the speech

he engaged in during that representation was a matter of public

concern."); Lee v. the Cty. of Passaic, 2011 WL 3159130, at *4

(D.N.J. July 26, 2011) (finding that plaintiff did not engage in

protected activity because, "[a]lthough these comments were made in connection to negotiations with the Union, concerns over personal salaries and benefits cannot be said to 'relat[e] to another matter of political, social, or other concern to the community.'") (quoting Connick, 461 U.S. at 146).

Accordingly, the Court rejects Plaintiffs' position that all union-related speech is per se protected activity and will proceed with the Garcetti analysis described above to assess whether Plaintiffs engaged in constitutionally protected activity.

To determine whether a matter is of public concern, courts consider whether "it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." Zelinski v. Penn. State Police, 108 F. App'x 700, 707 (3d Cir. 2004). "Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" Lane v. Franks, 134 S. Ct. 2369, 2380 (2014) (quoting Snyder v. Phelps, 562 U.S. 443, 444 (2011)). "The inquiry turns on the 'content, form, and context' of the speech." Id. (quoting Connick, 461 U.S. at 147-48).

A public employee's speech regarding a matter of public concern is only protected, however, if the employee spoke as a private citizen, rather than pursuant to their official duties. Gorum, 561 F.3d at 185.  In evaluating whether a police officer spoke as a private citizen, courts consider "whether the speech fell within the individual's job duties, whether it was related to special knowledge or experience acquired on the job, whether it was made inside or outside the work place, and whether it concerned the job's subject matter."  Houston v. Twp. of Randolph, 2013 WL 1192579, at *11 (D.N.J. Mar. 21, 2013); accord Gorum, 561 F.3d at 185-86 (holding that professor's advocacy on behalf of student in disciplinary proceedings was pursuant to his official duties because it was only due to his "special knowledge of, and experience with, the [school's] disciplinary code" and his position as a faculty member that he could assist the student in the first place).

### (a)  Speech or Conduct

In its November 2015 Opinion, this Court found that "the Plaintiffs have neglected to identify what [they] actually did or said to display their support of the twelve hours shifts" and, therefore, that the First Amended Complaint failed to properly allege constitutionally protected conduct.  November 2015 Opinion at 24-25.

24

The Court once again reiterates that "[p]laintiffs in First Amendment retaliation cases can sustain their burden of proof only if their conduct was constitutionally protected, and, therefore, only if there actually was <u>conduct</u>."  <u>Ambrose v. Twp. of Robinson, Pa.</u>, 303 F.3d 488, 495 (3d Cir. 2002) (emphasis in original); <u>accord</u> <u>Berkery v. Wissahickon Sch. Dist. Bd. of Directors</u>, 628 F. App'x 109, 112 (3d Cir. 2015) (affirming dismissal of First Amendment retaliation claim where plaintiff "does not specify what speech of hers caused her suspension"); <u>Fogarty v. Boles</u>, 121 F.3d 886, 891 (3d Cir. 2002) ("the absence of speech . . . is fatal to the plaintiff's [First Amendment retaliation] claim").

In the Second Amended Complaint, Plaintiffs attempt to remedy this deficiency by alleging that Plaintiffs Biazzo and Killion participated in meetings in 2010, 2011, and 2012 with Defendant Coffey and others regarding the implementation of twelve hour shifts.  SAC ¶¶ 28, 35.  Plaintiffs, however, do not set forth any allegations regarding their conduct or speech at these meetings.  The Second Amended Complaint also alleges that Plaintiff Biazzo responded to a memorandum from Defendant Coffey, but does not set forth the substance or contents of his response.  SAC ¶ 28g.

The Court remains unable to assess the nature of these two Plaintiffs' alleged support for twelve hour shifts from these

sparse allegations regarding their participation in contract negotiations.  The Plaintiffs have chosen to elaborate on Defendant Coffey's views and actions, stating, for example, that he "indicat[ed] his opposition to their implementation," that he "complain[ed] about the shifts," and "claimed that there were no 'pros' about the change."  SAC ¶¶ 28b, 28f, 28h, rather than describe what Plaintiffs said or did.  The Court agrees with the Defendants that Coffey's "conduct has no impact on Plaintiffs' obligation to identify what they did or said."  Defendants Coffey and Probasco Brief ("Coffey Br.") at 7 [Docket No. 92-3] (emphasis in original).

The allegations set forth only that Killion and Biazzo attended the meetings as members of the FOP 3 negotiating committee and that twelve hour shifts were discussed, leaving the Court to speculate as to the form and content of Plaintiffs' speech or conduct.  Additionally, mere "[m]embership in a union 'negotiating team' does not constitute conduct protected by the First Amendment" and "statements made by a public employee carrying out official duties, including negotiating terms of employment, are not entitled to First Amendment protection." Garvey v. Barnegat Bd. of Educ., 2008 WL 2902617, at *6 (D.N.J. July 24, 2008) (citing Garcetti, 547 U.S. at 421).

As for Plaintiff Kouvatas, the Second Amended Complaint now alleges that "[h]e has on numerous occasions pointed out that

the problems Coffey has with twelve hour shifts could be remedied if the supervisors were also on twelve hour shifts." SAC ¶ 152.  This is likewise inadequate to save the Second Amended Complaint.  This allegation suffers from the same infirmities previously identified by the Court, namely that it fails to identify with even a minimal degree of specificity when the speech occurred.  The Court remains unable to assess the relevance of this activity to Plaintiffs' First Amendment claims.  See November 2015 Opinion at 31.  Additionally, it is merely a repackaging of an allegation in the First Amended Complaint, which pleads that "[v]irtually . . . every one of [Coffey's] problems [with the twelve hour shifts] could be resolved if the supervisors reported on the same twelve hour schedule."  Amended Complaint ¶ 135.

The Second Amended Complaint continues to allege that in or around 2001 and 2007, Plaintiff Kouvatas authored a position paper regarding the benefits of twelve hour shifts, which he circulated among his peers.  The Court reiterates that "[g]iven the many years that passed between the publication of Plaintiff Kouvatas's position paper and the first actionable acts of alleged retaliation, [these allegations] cannot support a First Amendment retaliation claim."  November 2015 Opinion at 26.

Notably, the Second Amended Complaint sets forth no well-pled allegations of speech or conduct on the part of Plaintiffs

27

Hertline and Morton.  The amended pleadings contain no allegations of protected activity by Plaintiff Hertline, other than the bald statement that he "remains an active and vocal proponent of the twelve hour shift," SAC ¶ 113, which the Court has already found to be insufficient.  <u>See</u> November 2015 Opinion at 25.  As for Plaintiff Morton, Plaintiffs allege only that he "served on the Executive Board of FOP Lodge 3 beginning in 2007" and that "[h]e immediately began to work actively to obtain twelve hour shifts."  SAC ¶ 162.  This, too, is insufficient to establish the required element of protected activity.  Moreover, even if it could satisfy this element, as discussed further below, any protected activity that occurred in 2007 cannot support a timely First Amendment claim in light of the causation element.

Plaintiffs have also added a handful of allegations purporting to set forth union organizing efforts to support their freedom of association claim.  These, too, have not been adequately pled.  Rather, Plaintiffs set forth only conclusory allegations that are merely "unadorned, the-defendant-unlawfully-harmed-me accusation[s]."  <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550 U.S. at 555).  Such allegations cannot withstand a motion to dismiss.  <u>Id.</u> ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting <u>Twombly</u>, 550 U.S. at 557).

For example, Plaintiffs baldly allege that Plaintiff Hertline "has been denied administrative leave time to attend FOP meetings," SAC ¶ 116, without any "further factual enhancement," as required by Iqbal and Twombly, such as pleading when or by whom or why.  Likewise, the Second Amended Complaint alleges that certain of the Plaintiffs attended a FOP conference on officers' rights during internal affairs investigations and that when unidentified union members, at some unspecified time, "insist[ed] on following proper due process and asserting their rights," Defendant Coffey became enraged.  SAC ¶¶ 193-95.  Plaintiffs additionally claim that Coffey "directly tried to intervene with the appointment of the members of the negotiating committee," yet fail to disclose when or how this occurred.  SAC ¶ 196.  Finally, Plaintiffs claim that Hertline ran a union banquet on some undisclosed date, but that the police "[a]dministration refused to participate in the issuance of joint awards."  SAC ¶ 197.  The Court agrees with the Defendants that "[n]ot only is there no indication when this occurred, but running an event does not rise to the level of constitutional protection."  Coffey Br. at 24.  For the reasons articulated by the Court above and in the November 2015 Opinion, the lack of specificity as to the form, timing, content, and context of any potentially protected speech or conduct is fatal to Plaintiffs' claims.

29

For the foregoing reasons, the Court once again finds that Plaintiffs' First Amendment claims must fail, as they have failed to adequately plead conduct that allegedly resulted in retaliation.

### (b)  Private Citizen

In any case, even if any of the amended pleadings could be considered well-pled allegations of conduct, Plaintiffs have failed to adequately plead that they were speaking or acting as private citizens, as opposed to pursuant to their official duties.  This, too, is fatal to their claims.  Plaintiffs claim that "[i]t is not part of the police officer's job to participate in the Union, negotiate a contract, or save municipality money or avoid layoffs of police officers."  Pls. Opp. Br. at 17.  Accordingly, Plaintiffs argue, their speech was protected because "[n]one of these things were part of the Plaintiffs' job duties."  Id. at 18.  The Court is not persuaded by Plaintiffs' argument.

"The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform."  Garcetti, 547 U.S. at 424-25.  Accordingly, "a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job."  Gorum,

561 F.3d at 185.  Plaintiffs' membership in the FOP 3 alone does not indicate that they were speaking as private citizens.

Rather, to the extent that Plaintiffs spoke or acted regarding a matter of public concern, Plaintiffs did so to advance their positions as police officers.  Plaintiffs were able and eager to advocate for the implementation of twelve hour shifts precisely because of their employment as police officers and the special knowledge and experience acquired through that employment.  Accordingly, the Court finds that Plaintiffs have failed to allege that they were speaking as private citizens. See id. at 185-86; see also Beresford, 2010 WL 45684, at *6 ("Plaintiff was not acting as a private citizen when engaging in speech as a public employee and President of the WITA union because such speech was performed while Plaintiff was in his official capacity as negotiator for his union."); Hill v. City of Philadelphia, 2008 WL 2622907, at *6 (E.D. Pa. June 30, 2008), aff'd, 331 F. App'x 138 (3d Cir. 2009) ("Any activity or related speech which allegedly led to retaliation against [plaintiff] was conducted pursuant to his official duties as a union delegate acting on behalf of employees of a municipal agency, and not as a citizen.").

### (c)  Matter of Public Concern

In its November 2015 Opinion, "this Court question[ed], without making any determinations at th[at] juncture, whether

support for the implementation of twelve hour shifts is truly a matter of public concern." November 2015 Opinion at 26 (citing Thomas, 626 F. App'x at 388. The Court now takes the opportunity to squarely address this question.

Whether an exercise of speech is on a matter of public concern is a question of law. Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004). "[T]he key to the 'public concern' inquiry is 'whether the expression of the kind at issue is of value to the process of self-governance.'" Montone v. City of Jersey City, 709 F.3d 181, 193 (3d Cir. 2013) (quoting Azzaro v. Cty. of Allegheny, 110 F.3d 968, 977 (3d Cir. 1997)). Generally, speech on a matter of public concern "addresses a social or political concern of the community" or "relates to broad social or policy issues, including expressing the desirability of assassinating the President or complaining about racial discrimination." Borden, 523 F.3d at 170. Likewise, speech may address an issue of public concern if it "implicat[es] the discharge of public responsibilities by an important government office, agency, or institution," such as government corruption, lowering of academic standards, or "bring[ing] to light actual or potential wrongdoing or breach of public trust on the part of government officials." Id. (quoting Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993); Sanguigni, 968 F.2d at 397-98). "Finally, the content of speech

is on a matter of public concern where it 'relate[s] primarily
to the way in which a government office [i]s serving the
public,'" such as a government "wasting taxpayer's money."  Id.
(quoting Sanguigni, 968 F.2d at 398; citing Czurlanis v.
Albanese, 721 F.2d 98, 104 (3d Cir. 1983)).  "Whether an
employee's speech addresses a matter of public concern must be
determined by the content, form, and context of a given
statement, as revealed by the whole record."  Connick, 461 U.S.
at 147.

When a public employee speaks "upon matters only of
personal interest," rather than "matters of public concern," a
First Amendment claim does not lie.  See id.  Additionally, "the
First Amendment does not require a public office to be run as a
roundtable for employee complaints over internal office
affairs."  Id. at 149.  Accordingly, "[w]hile the First
Amendment invests public employees with certain rights, it does
not empower them to constitutionalize the employee grievance."
Abernethy, Jr. v. Mercer, 532 F. App'x 160, 163 (3d Cir. 2013);
accord Morris v. Philadelphia Hous. Auth., 487 F. App'x 37, 40
(3d Cir. 2012) ("The Supreme Court has decided, however, that we
should not constitutionalize management disputes between the
government and its employees.").  In light of this, the Third
Circuit has explained that "internal workplace matters and
personal grievances . . . clearly fall outside the sphere of

First Amendment protection." Garcia v. Newtown Twp., 483 F.
App'x 697, 703 (3d Cir. 2012). Likewise, where a plaintiff's
speech or conduct does "not seek to communicate to the public or
to advance a political or social point of view beyond the
employment context," the Third Circuit has held that such
activity does not address a matter of public concern. Emigh v.
Steffee, 442 F. App'x 660, 666 (3d Cir. 2011) (quoting Borough
of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 398 (2011)).

    The Court has evaluated the content, form, and context of
Plaintiffs' alleged speech to the best of its ability in light
of the bare-boned pleadings. The Second Amended Complaint
indicates that the Plaintiffs expressed their support for twelve
hour shifts only in the context of the workplace, among
coworkers and in contract negotiation meetings. There was no
effort to inform the public about the issue or the benefits that
Plaintiffs argue stem from the implementation of twelve hour
shifts. In fact, there is no allegation in the Second Amended
Complaint that the Plaintiffs even expressed their opinions
about the collateral benefits of twelve hour shifts to the
Defendants. The Court has no information whatsoever about the
specific form or content of Plaintiffs' speech or conduct
regarding the twelve hour shifts. All that the Second Amended
Complaint alleges is that Plaintiffs were in favor of the
implementation of twelve hour shifts and that such support was

34

apparently made exclusively within the police department and often, if not always, in contract negotiation meetings regarding the shifts.

The Court finds that, as alleged, Plaintiffs' support of twelve hour shifts related only to their working conditions and a management dispute about an internal workplace policy, namely the length and scheduling of the officers' shifts, and did "not seek to communicate to the public or to advance a political social point of view beyond the employment context." See Garcia, 483 F. App'x at 703; Emigh, 442 F. App'x at 666. Accordingly, assuming that Plaintiffs had adequately alleged speech or conduct as private citizens, which the Court has already held they have not, the Court also finds that Plaintiffs alleged support of twelve hour shifts did not address a matter of public concern.

The fact that Plaintiffs are union members does not change this Court's analysis.[6]  In Thomas, the Third Circuit found that

---

[6] Plaintiffs argue that union organization activities and efforts are unconditionally matters of public concern.  The cases cited by Plaintiffs, however, directly involved union organization efforts, not just speech made by union members.  See Perna v. Twp. of Montclair, 2006 WL 2806276, at *8 (D.N.J. Sept. 28, 2006) (finding that plaintiff alleged a matter of public concern because she alleged "involve[ment] in union organizational and representational efforts"); Schlichter v. Limerick Twp., 2006 WL 2381970, at *8 (E.D. Pa. Aug. 14, 2006) ("a public employee's attempt to unionize would always be considered a matter of public concern") (emphasis added); Hinshillwood v. Cty. of Montgomery, 2002 WL 253940, at *4 (E.D. Pa. Feb. 20, 2002)

the plaintiff's "union grievances are not protected because they do not involve matters of public concern."  626 F. App'x at 388. The court acknowledged that while "union activities may sometimes touch on a matter of public concern, . . . it is not the case that all union-related grievances do."  Id.  The Thomas court found that the plaintiff's speech "related to working conditions and other issues in union members' employment, . . . and [plaintiff] offers nothing that would transform those personnel matters into issues of interest to the broader community," and, accordingly, that it was not protected.  Id. at 389; see also Harris v. Quinn, 134 S. Ct. 2618, 2655 (2014) (Kagan, J., dissenting) ("Our decisions . . . teach that internal workplace speech about public employees' wages, benefits, and such--that is, the prosaic stuff of collective bargaining--does not become speech of 'public concern' just because those employment terms may have broader consequence.") (citing Duryea, 564 U.S. 379, 391; Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr, 518 U.S. 668, 675 (1996)).

Here, too, the Plaintiffs' alleged speech or conduct, to the extent that any such speech or conduct has been adequately pled, also addressed their working conditions and the union

---

("[s]peech arising in the context of union organization efforts") (emphasis added).  Yet Plaintiffs concede that they were not involved in any union organization efforts.  Pls. Opp. Br. at 16.

members' terms of employment. Plaintiffs make no allegations that the purported benefits to the community regarding twelve versus eight hour shifts were ever communicated to the Defendants or the public. For this reason, the Court finds that Plaintiffs have not properly alleged speech addressing a matter of public concern, as required to plead a First Amendment violation.

Plaintiffs remain unable to adequately plead constitutionally protected conduct, as required for both Plaintiffs' freedom of speech and freedom of association claims. Accordingly, the Plaintiffs' First Amendment retaliation claims under Section 1983 (Counts I and II) are dismissed with prejudice. For the same reasons, Plaintiffs' New Jersey Civil Rights Act claim (Count III) is also dismissed with prejudice.

### ii. **Retaliatory Conduct**

To adequately plead the retaliatory conduct prong, Plaintiffs must allege "retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights." Thomas, 463 F.3d at 296. The effect of the alleged retaliation on a plaintiff's freedom of speech "need not be great in order to be actionable but it must be more than de minimis." Hogan v. Twp. of Haddon, 278 F. App'x 98, 103 (3d Cir. 2008) (internal citations and quotations omitted). "[E]ven an act of retaliation as trivial as failing to hold a birthday

party for a public employee . . . when intended to punish her
for exercising her free speech rights" may be sufficient to
constitute retaliatory action for purposes of a First Amendment
retaliation claim.  See Suppan v. Dadonna, 203 F.3d 228, 234 (3d
Cir. 2000) (quoting Rutan v. Republican Party, 497 U.S. 62, 76
n. 8 (1990)).  "A First Amendment retaliation claim will lie for
any individual act which meets this 'deterrence threshold,' and
that threshold is very low[.]"  O'Connor v. City of Newark, 440
F.3d 125, 128 (3d Cir. 2006).

Applying this standard, the Court found, in its November
2015 Opinion, that "[w]hile the Amended Complaint is fatally
lacking in other respects, it adequately pleads retaliatory
conduct as required to state a First Amendment claim."  November
2015 Opinion at 30.  However, the Court found that any acts of
alleged retaliation occurring prior to March 22, 2011 were
barred by the two-year statute of limitations governing Section
1983 claims and dismissed any claims premised upon these acts
with prejudice.  Id. at 21-22.

The Second Amended Complaint restates the bulk, if not all,
of the allegations of timely retaliatory conduct that the Court
found sufficient in its November 2015 Opinion.  For example,
Plaintiffs allege once again that, on May 24, 2012, Killion was
transferred to "the nightshift to work in the Dispatch Room
while on-duty" and that "[t]his is the first time in the history

38

of the [Pennsauken Police] Department that [Defendant] Coffey transferred an officer on light-duty to the nightshift." SAC ¶ 62. The Second Amended Complaint also alleges that Hertline and several other officers were given permission to attend a training session in Texas, but that Defendant Coffey "changed every attendees' days off so they could attend the conference without financial penalty, except for Hertline." SAC ¶¶ 138-39. Plaintiffs also allege that Biazzo has been formally disciplined on several occasions by Defendant Coffey and suspended without pay, SAC ¶¶ 84-88, 104, and that Kouvatas was served with a Preliminary Notice of Disciplinary Action on May 12, 2014. SAC ¶ 157. Likewise, Morton has been charged and disciplined by Defendant Coffey. SAC ¶¶ 170-71.

Given the allegations of formal discipline and other acts of retaliatory conduct in the Second Amended Complaint, the Court once against finds that Plaintiffs have adequately pled retaliatory conduct as required to state a First Amendment retaliation claim.[7]

---

[7] As the Court ultimately finds that the Second Amended Complaint fails to adequately plead a claim under Section 1983, the Court does not reach the Township Defendants' argument that Plaintiffs have failed to allege a custom or policy by the Township of Pennsauken, as required for municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). See Twp. Br. at 10-11.

### iii.  **Causal Link**

To state a claim for First Amendment retaliation, the
Plaintiffs must allege causation, namely that their protected
activity was a substantial or motivating factor behind the
Defendants' retaliation.  Springer v. Henry, 435 F.3d 268, 275
(3d Cir. 2006).  The Plaintiffs must do more than allege the
"mere possibility of misconduct."  See Iqbal, 556 U.S. at 679.
Additionally, the Third Circuit has directed courts to "be
diligent in enforcing these causation requirements [in Section
1983 First Amendment cases] because otherwise a public actor
cognizant of the possibility that litigation might be filed
against him, particularly in his individual capacity, could be
chilled from taking action that he deemed appropriate and, in
fact, was appropriate."  Lauren W. ex rel. Jean W. v.
DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

"Because motivation is almost never subject to proof by
direct evidence, [Plaintiffs] must rely on circumstantial
evidence to prove a retaliatory motive.  [Plaintiffs] can
satisfy [their] burden with evidence of either (1) an unusually
suggestive temporal proximity between the protected activity and
the allegedly retaliatory action, or (2) a pattern of antagonism
coupled with timing that suggests a causal link."  Watson v.
Rozum, -- F.3d --, 2016 WL 4435624, at *2 (3d Cir. Aug. 23,
2016).  Accordingly, a determination as to whether a causal link

has been adequately pled requires an inquiry into the temporal proximity between the alleged protected activity and the alleged retaliation.  See Queer v. Westmoreland Cnty., 296 F. App'x 290, 293 (3d Cir. 2008).  "[A] suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation." Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003).  However, the temporal proximity of the alleged retaliation "must be unusually suggestive of retaliatory motive before a causal link will be inferred." Id.  Where the temporal proximity alone is not "unusually suggestive," "timing plus other evidence may be an appropriate test[.]" Id.  This other evidence may be "gleaned from the record as a whole," and may include, for example, a pattern of antagonism.  See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000).

In its November 2015 Opinion, the Court held that Plaintiffs' Amended Complaint failed to adequately plead the requisite causal link between their allegedly protected conduct and Defendants' allegedly retaliatory conduct.  November 2015 Opinion at 30-33.  The Court explained that "given the paucity of well-pled allegations of protected activity," the Court could not "make any determinations regarding the timing of said 'vocal support' or its temporal proximity to the alleged retaliatory actions." Id. at 31-32.  Plaintiffs were well-aware of the need to remedy this deficiency and yet, by and large, did not do so.

To the extent that the Second Amended Complaint once again fails to identify the timing and nature of specific instances of allegedly protected speech or conduct, the Court remains unable to assess the temporal proximity between Plaintiffs' allegedly protected activity and Defendants' alleged retaliation.

As the Court noted above, however, the Plaintiffs have included some additional information regarding their speech in support of the twelve hour shifts, such as the meetings between FOP 3 members and the police administration.  The Plaintiffs appear to concede that the temporal proximity between these instances of protected activity and any timely acts of alleged retaliation alone is insufficient to establish the requisite causal link.  See Pls. Opp. Br. at 19-22.  Instead, Plaintiffs argue that they "have alleged both temporal proximity and other evidence which together, in the light most favorable to the plaintiffs sets forth a plausible claim for causation."  Id. at 22.  Plaintiffs direct the Court to the long history of alleged retaliation, which Plaintiffs claim began only when negotiations regarding the implementation of twelve hour shifts commenced.

While Plaintiffs may have met the "other evidence" prong of this test by alleging that they have a long history of being disciplined and retaliated against by the Defendants, the timing element is entirely lacking.  See Watson, 2016 WL 4435624, at *4 ("Where the temporal proximity is not so close as to be 'unduly

42

suggestive,' the appropriate test is <u>timing</u> plus other evidence.") (emphasis added) (internal quotations and alterations omitted); <u>see also</u> <u>Scrip v. Seneca</u>, -- F. App'x --, 2016 WL 3162695, at *4 (3d Cir. June 7, 2016) (finding that plaintiff "failed to show a 'pattern of antagonism,' which, <u>coupled with timing</u> would allege a plausible causal link" because "two unspecified disciplinary actions over a period of more than seventeen months do not create 'pattern of antagonism.'") (emphasis added).

With regard to Plaintiffs Hertline and Morton, the Court cannot identify any well-pled allegations of protected speech from which to measure temporal proximity or infer a causal link. Where the Plaintiffs do not identify the allegedly protected conduct at all, as with Plaintiffs Hertline and Morton, or the date of their allegedly protected conduct, as in the case of Plaintiff Kouvatas "point[ing] out that the problems Coffey has with twelve hours [sic] shifts could be remedied if the supervisors were also on twelve hour shifts," SAC ¶ 152, the Court is unable to assess the temporal proximity or causal relationship between Plaintiffs' allegedly protected conduct and Defendants' alleged retaliation. <u>See</u> November 2015 Opinion at 31-32.

Additionally, as the Court found above and in its November 2015 Opinion, Plaintiff Kouvatas's authoring of a position paper

regarding twelve hour shifts and his dissemination of that information, which occurred in or around 2001 and 2007, cannot support any timely claims of First Amendment retaliation due to the passage of several years.  See November 2015 Opinion at 32 (citing Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004); Estate of Smith v. Marasco, 318 F.3d 497, 512-13 (3d Cir. 2003)); see also Arneault v. O'Toole, 513 F. App'x 195, 198 (3d Cir. 2013) (holding that "[f]ive retaliatory actions, undertaken by several different defendants over the course of four years allegedly in response to complaints against several different defendants, are not sufficient in this case" to plead causation in retaliation claim).

Likewise, even if Plaintiffs Killion and Biazzo's attendance at various meetings in 2010, 2011, and 2012 were well-pled allegations of protected conduct, which the Court has already ruled they are not, Plaintiffs have not pled a causal link between their participation in these meetings and any alleged retaliation.  For example, the three April 2010 meetings that Plaintiffs Killion and Biazzo attended occurred over a year before the first timely allegation of retaliation in May 2011, after the Pinsetters Incident.  The Court sees no temporal proximity whatsoever between these meetings and any timely alleged retaliation.  See Queer, 296 F. App'x at 293 ("taking

44

into consideration [plaintiff's] 'timeline' of events, it is
difficult to discern <u>any</u> temporal proximity between
[plaintiff's] protected speech in March 2004 and the
[defendant's] nonrenewal decision more than a year later[.]")
(emphasis in original).

As for the allegations regarding the 2012 meetings, which
the Court has already found do not constitute well-pled
allegations of protected conduct, a causal link cannot be
inferred given the months that passed between the meetings and
any actionable allegations of retaliation.  Moreover,
Plaintiffs' own pleadings establish that much of the alleged
retaliation was actually justified discipline as a result of
various infractions, such as the Pinsetters Incident.[8]  The
inference gleaned from the Second Amended Complaint as a whole,
then, is that the discipline was justified by Plaintiffs' own
infractions, for example, and not that it was retaliation for
allegedly protected activity.  <u>See</u> <u>Thomas</u>, 351 F.3d at 114
(finding that passage of three weeks between alleged protected

---

[8] While the Court's findings do not rely solely on this, the
Court nonetheless notes that after Killion, Hertline, and Biazzo
appealed the discipline received as a result of the Pinsetters
Incident, the Superior Court of New Jersey, Appellate Division
affirmed the suspensions.  <u>See</u> <u>In the Matter of Michael Biazzo,</u>
<u>Douglas Foster, William Hertline, III, Vito Moles, Michael</u>
<u>Killion & Michael Hutnan, Twp. of Pennsauken Police Dep't</u>, No.
A-3537-13T1, 2016 WL 5173411, at *5 (N.J. Super. Ct. App. Div.
Sept. 22, 2016).

activity and termination and allegations of "other evidence" was insufficient to establish causal link because "the chronology of events far more strongly suggests a situation in which a probationary employee was determined to be a poor risk as far as dependability was concerned," rather than illegal retaliation).

Additionally, the Second Amended Complaint repeats the errors of the Amended Complaint as it fails to allege when many acts of retaliation took place. See, e.g., SAC ¶ 43 (alleging that Defendant Coffey changed Plaintiff Killion's days off at some indeterminate time); ¶ 116 ("Since Hertline's support for the twelve hour shifts, he has been denied administrate leave time to attend FOP meetings."); ¶ 149 (alleging that, at some unspecified time, an unidentified supervisor "yelled and used obscenities to Kouvatas whenever the subject of twelve hour shifts came up."); ¶ 169 (alleging that, at some point, Morton requested a transfer, which Coffey denied). The Court reiterates that it cannot determine whether these acts are time-barred or causally linked to any allegations of speech. Because Plaintiffs have failed to remedy these defects, the allegations cannot support a First Amendment retaliation claim.

The Defendants note that Plaintiffs "seem to allege that their long-term support for this new work rule somehow imbues them with long-term protection. . . . That is not the law." Coffey Br. at 22. The Court agrees. Accordingly, Plaintiffs'

claims fail because Plaintiffs have not adequately pled constitutionally protected activity or the requisite causal link between their conduct and Defendants' alleged retaliation.

### B. Qualified Immunity

Defendants argue that, even if Plaintiffs have adequately alleged a constitutional violation, Defendant Coffey and Probasco and the Individual Defendants are entitled to qualified immunity.  As the Court dismisses the Plaintiffs' constitutional claims, it need not reach the issue of qualified immunity. Nonetheless, in an abundance of caution, the Court will address the question.  For the foregoing reasons, the Court finds that, even if the Defendants had violated the Plaintiffs' constitutional rights, which the Court has already found they did not, qualified immunity would shield the Defendants Coffey and Probasco and the Individual Defendants from liability.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009); accord Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014) ("An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct.").

The question of whether these Defendants are entitled to qualified immunity requires this Court to answer two questions: "(1) whether the officer violated a constitutional right," and "(2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 201-02 (2001).  The questions may be answered in either order.  Pearson, 555 U.S. at 242.

As to the first question, the Court reiterates that it has already found that the Defendants did not violate any constitutional rights.  Moving to the second inquiry, Plaintiffs argue that their First Amendment "rights to free speech and union activity are well established."  Pls. Opp. Br. at 27. This misses the point.  In determining whether Coffey, Probasco, and the Individual Defendants' actions or inactions violated a "clearly established right," the "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (citing Saucier, 533 U.S. at 206).  While the freedom of speech and freedom of association under the First Amendment, in the abstract, are certainly clearly established constitutional rights, that is not the correct inquiry.  See id.  The Court must instead assess the specific circumstances of the case.

Here, the relevant question is whether a police officer's conduct or speech in support of the implementation of twelve hour shifts is an exercise of a clearly established constitutional right, such that it would have been clear to the Defendants that their alleged retaliation for that conduct, in the case of Coffey and Probasco, or their failure to investigate such retaliation, in the case of the Individual Defendants, was unlawful.  In the context of this case, the Court cannot find that Plaintiffs' speech and conduct, as alleged in the Second Amended Complaint, constituted an exercise of a clearly established constitutional right.  Accordingly, the Court finds that qualified immunity is appropriate.

As the Court has already detailed, the form, content, and context of Plaintiffs' support for twelve hour shifts, as well as the relevant legal precedents, indicate that such support did not address a public concern and was made pursuant to the Plaintiffs' official duties, not as private citizens.  See supra sections III.A.i.(b)-(c).  It would not have been clear to a reasonable officer or committee member, confronted with Plaintiffs' support for twelve hour shifts, that the Plaintiffs were exercising any clearly established First Amendment rights and, therefore, that any retaliation or failure to investigate

that retaliation would be unlawful.[9]  Accordingly, even if
Plaintiffs had adequately pled a constitutional violation in the
Second Amended Complaint, which the Court has already found, for
several reasons, they have not, qualified immunity would
nonetheless shield Defendants Coffey and Probasco and the
Individual Defendants from liability.[10]

---

[9] In addition, the Court observes, without making any findings as
to this question, that if the Defendants "reasonably believed
that the [Plaintiffs'] [speech] had involved personal matters,
not matters of public concern, and [Defendants] had [retaliated
against] the [Plaintiffs] because of that mistaken belief, the
[retaliation] did not violate the First Amendment." Waters v.
Churchill, 511 U.S. 661, 679-80 (1994).  In light of the case
law discussed above, such belief would likely be reasonable.
[10] The Individual Defendants also contend that they cannot be
sued in their official capacities and that Plaintiffs have
failed to plead with specificity any conduct outside the scope
of their official duties such that individual liability may be
appropriate.  Twp. Br. at 11-15.  Even if Plaintiffs had
properly alleged a constitutional violation and qualified
immunity did not attach, the claims against the Individual
Defendants in their official capacities must be dismissed as
redundant of the claims against the Township of Pennsauken.  See
Cuvo v. De Biasi, 169 F. App'x 688, 693 (3d Cir. 2006) ("We will
affirm the District Court's dismissal of the claims against the
officers in their official capacities because a lawsuit against
public officers in their official capacities is functionally a
suit against the public entity that employs them.  Because Cuvo
is suing Palmer Township, the suit against the officers in their
official capacities is redundant.") (internal citations
omitted); Lue v. Borough of Collingdale, 2015 WL 70931, at *7
(E.D. Pa. Jan. 6, 2015) (collecting cases).  Additionally, the
Court agrees that the claims against the Individual Defendants
in their individual capacities must be dismissed because the
Second Amended Complaint includes no allegations of "individual
conduct that results in liability" that would render them
amenable to suit in their individual capacities.  See Gerber ex
rel. Gerber v. Springfield Bd. of Educ., 328 N.J. Super. 24, 40
(App. Div. 2000) ("The Board may be liable to suit as an entity,

## C. Punitive Damages

Plaintiffs once again set forth a separate count alleging punitive damages.  In its November 2015 Opinion, this Court dismissed the punitive damages claim with prejudice against Defendant Township of Pennsauken because "no punitive damages may be awarded against a municipality in Section 1983 actions." November 2015 Opinion at 33 (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981)).  The claim was otherwise dismissed without prejudice against the remaining Defendants.

The Court will now dismiss the punitive damages claim (Count IV) with prejudice against all Defendants.  Punitive damages are a remedy, not a substantive cause of action.  Taylor v. Lincare, Inc., 2016 WL 3849852, at *8 (D.N.J. July 15, 2016); In re Paulsboro Derailment Cases, 2015 WL 4914397, at *10 (D.N.J. Aug. 18, 2015).  Accordingly, since the Plaintiffs' constitutional claims will be dismissed with prejudice by this Opinion and the accompanying Order, the punitive damages claim must also be dismissed with prejudice.  A request for punitive damages cannot stand in the absence of underlying substantive claims.  Taylor, 2016 WL 3849852, at *8 (quoting Smith v. Whitaker, 160 N.J. 221, 235 (1999) ("As a rule, a claim for

---

but in the absence of individual conduct that results in liability, the Board members are shielded from suit.").

punitive damages may lie only where there is a valid underlying cause of action.”)).

### D. Dismissal With Prejudice

Defendants urge this Court to dismiss Plaintiffs' Second Amended Complaint in its entirety with prejudice.  Federal Rule of Civil Procedure 15(a)(2) provides that “court[s] should freely give leave [to amend] when justice so requires.”  The Supreme Court has held, and the Third Circuit has reiterated, that while “the grant or denial of an opportunity to amend is within the discretion of the District Court, . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules.”  Foman v. Davis, 371 U.S. 178, 182 (1962); accord In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

“[E]ven when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile. . . . Dismissal without leave to amend is justified only on the ground of bad faith, undue delay, prejudice, or futility.”  Alston v. Parker, 363 F.3d 229, 235-36 (3d Cir. 2004).

Dismissal with prejudice, however, may be an appropriate exercise of discretion where the court has previously provided the plaintiffs with "a detailed roadmap for curing the deficiencies in their claims" and the plaintiffs still fail to remedy those deficiencies in the amendment. See California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 166 (3d Cir. 2004) (affirming district court's dismissal of second amended complaint with prejudice where district court had previously dismissed first amended complaint with leave to amend and "provided Plaintiffs with a detailed blueprint of how to remedy the defects in their claims" but plaintiffs "utterly failed to comply with the District Court's directives.").

This Court's November 2015 Opinion dismissing the Plaintiffs' First Amended Complaint addressed the Plaintiffs' allegations and identified the numerous deficiencies therein, yet permitted the Plaintiffs an opportunity to remedy those deficiencies. For example, the Court explained to the Plaintiffs the need to identify the specific allegedly protected speech or conduct in which the Plaintiffs engaged, as well as the acts of alleged retaliation by Defendants. See, e.g., November 2015 Opinion at 22, 25. The Court also explicitly and methodically addressed each of the "required elements to provide guidance to the parties." See id. at 28. In this Court's view, its November 2015 Opinion served as "a detailed roadmap for

curing the deficiencies in [Plaintiffs'] claims." See Chubb Corp., 394 F.3d at 166.

The Second Amended Complaint is the Plaintiffs' third bite at the proverbial apple.  The Court cautioned Plaintiffs that no further amendments would be permitted.  November 2015 Opinion at 1 ("The Plaintiffs, however, will be granted leave to amend their complaint one final time to cure the deficiencies identified herein.") (emphasis added).  Yet, the Second Amended Complaint suffers from the same infirmities as the First Amended Complaint, as outlined above.  Plaintiffs remain unable or unwilling to allege specific instances of protected activity or the requisite causal link between such activity and Defendants' alleged retaliation, despite having received three opportunities to do so.  The Court notes, in particular, the "stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced, which would, if true, cure the defects in the pleadings" under the requirements set forth in Iqbal and Twombly.  See Chubb Corp., 394 F.3d at 164.  Additionally, the Court has now resolved the question it left open in the November 2015 Opinion, namely whether the implementation of twelve hour shifts is a matter of public concern -- it is not.

Accordingly, the Court finds that any further amendment would be futile in light of the ample opportunities already

granted to the Plaintiffs.  The Court also notes the lengthy history of this action, which has been stalled in the pleadings stage for over three years.  Defendants have been required to defend against three complaints.  In this Court's view, it would be inequitable to permit the Plaintiffs to file yet another complaint and subject the Defendants to further litigation.  For these reasons, the Second Amended Complaint will be dismissed with prejudice and no further leave to amend will be granted.

## IV.  CONCLUSION

For the foregoing reasons, the Court grants the Defendants' Motions to Dismiss the Second Amended Complaint with prejudice [Docket Nos. 92, 93].  The Second Amended Complaint is dismissed with prejudice in its entirety.  An appropriate Order shall issue on this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: September 27, 2016